UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

WASTE MANAGEMENT, INC.,

NO. CIV. S-04-2028 WBS DAD

        Plaintiff,

    v.

<u>MEMORANDUM AND ORDER RE:</u>
<u>MOTION FOR SUMMARY JUDGMENT</u>

ISHIKAWAJIMA-HARIMA HEAVY
INDUSTRIES, CO., LTD. and DOES
1 through 10, inclusive,

        Defendants.

----oo0oo----

Plaintiff Waste Management, Inc. filed this lawsuit in the Superior Court of California in and for the County of Shasta to recover damages for defendant Ishikawajima-Harima Heavy Industries, Co., Ltd.'s alleged failure to properly repair an IM5000 power turbine purchased from defendant by plaintiff's predecessor. Defendant removed the case to this court and now seeks summary judgment pursuant to Federal Rule of Civil Procedure 56(c). Jurisdiction is predicated on 28 U.S.C. § 1332. For the following reasons, defendant's motion will be granted.

///

1

1    I.    Factual and Procedural Background

2              Pursuant to a contract entered into in 1981,

3    plaintiff's predecessor-in-interest, Simpson Paper Company,

4    purchased an IM5000 gas power turbine from defendant for use at

5    its co-generation power plant in Anderson, California (the

6    "Wheelabrator Lassen facility").  (Yasunaga Shimura Decl. ¶ 2;

7    Compl. ¶ 1.)  The contract included a warranty that limited

8    defendant's liability for "defects in material and workmanship

9    for a period of twelve (12) months from the date of ACCEPTANCE of

10   the EQUIPMENT . . . or twenty-three (23) months from delivery of

11   the EQUIPMENT . . ., whichever occurs first."  (Shimura Decl. Ex.

12   A at 25 (Article 12.1).)  It also excluded liability for

13   consequential damages arising from the owner's inability to

14   operate the turbine due to defects in material or workmanship.

15   (Id. at 29 (Article 12.6).)  This "Warranty of Quality" was, in

16   no uncertain terms, defendant's "sole and exclusive" warranty.

17   (Id. (Article 12.5).)  It "replace[d] any other warranty or

18   guarantee imposed or implied by law, customarily or otherwise."

19   (Id.)

20             Whether future maintenance of the turbine was part of

21   the 1981 agreement is somewhat less clear.  On one hand, Appendix

22   G in the Technical Specifications discusses a "Maintenance Plan"

23   and suggests that the parties intended for defendant to perform

24   future inspections and maintenance on the turbine.[1]  (Id. at 178-

25

26         [1]   Although these provisions describe "preventative
     maintenance" inspections and "corrective maintenance" procedures
27   without specifying who will conduct such activities, the
     agreement does specify that "off-site maintenance", required when
28   repairs are extensive, will be conducted at "manufacturers'

                                    2

1  79 (Tech. Specs. App. G, Section 5); <u>see also</u> <u>id.</u> at 27 (Article
2  12.3(7) (excluding from warranty coverage replacements made
3  without defendant's approval or supervision--thus implying that
4  replacements made otherwise <u>were</u> covered).)  On the other hand,
5  Article 12 in the purchase agreement details maintenance and
6  repair services that defendant agreed to supply only "during the
7  period of the Warranty described in Section 12.1 . . . ." (<u>Id.</u>
8  at 25 (Article 12.2).)  Additionally, the "technical services"
9  that defendant contracted to supply did not include maintenance
10 services for the life of the turbine. (<u>Id.</u> at 50 (Tech. Specs
11 1.1.4).)  In contrast to Appendix G, these sections suggest that
12 maintenance and repair services were not a part of the 1981
13 agreement beyond the warranty period.

14       Exactly what goods and services defendant contracted to
15 provide--and when--is at the heart of this dispute, which arose
16 on August 7, 2000 when three "blade retainers of the rotor disk
17 failed" and "extensively damaged" the turbine.  (Compl. ¶¶ 8-9.)
18 Leading up to this event, defendant had recently performed
19 various repairs on the turbine, which had surpassed its designed-
20 for operational capacity of 100,000 hours.[2]  In particular, on
21 December 16, 1999, defendant billed plaintiff for $345,000.00 of

22 _____

23 facilities." (Shimura Decl. Ex. A at 178-79 (Tech. Specs. App.
24 G, Section 5).)

25     [2]   Even the turbine's rotor (and its component blade
   retainers), which had been replaced in 1988 after suffering
26 damage caused by "gas generator HPT disk pieces", had surpassed
   the design life expectation of 100,000 hours by August, 2000.
27 (Tsuyoshi Ishizuka Decl. Ex. E at 201.)  "At the time of the
   alleged failure, [the IM5000] had operated for approximately
28 137,000 useful life hours" and "the replacement rotor had
   operated for approximately 100,800 hours." (<u>Id.</u> ¶ 6.)

1  "Power Turbine Repair" work.  (Akio Suzuki Decl. Ex. F at 224.)

2  It also advised plaintiff in January, 2000, that further

3  inspection and planning would be necessary to prolong the use of

4  plaintiff's turbine.  (Ishizuka Decl. Ex. D at 197.)

5  Subsequently, in May, 2000, defendant's representative, Tsuyoshi

6  Ishizuka, prepared a "Report of IM5000 Power Turbine Repair" in

7  which he noted that the rotor disks were "under high stress" and

8  recommended that they be replaced "with the new ones if

9  Wheelabrator plans to use the IM5000 . . . more longer."  (Id.

10 Ex. E at 201-02.)

11        In mid-July, less than a month before the aging turbine

12 package gave out, plaintiff was still contemplating whether to

13 replace or refurbish its IM5000.  (Furman Decl. Ex. 3 (E-mail

14 from George Woodward to defendant's representatives reminding

15 them that plaintiff was still waiting on a quote for replacement

16 costs and proposing an alternative plan to extend the life of the

17 existing IM5000).)  Meanwhile, it continued to operate the unit,

18 despite the fact that several of its components had operated for

19 significantly longer than their life expectancy.  (Id. Ex. 2

20 (June 5, 2000 letter from Reiji Ishimoto to William Carlson

21 (reminding plaintiff that its IM5000 had "run more than 133,000

22 hours to date")).)  Plaintiff does not dispute that it was aware

23 of a service notice issued by defendant in 1995, in which

24 defendant warned customers that "continuous operation over

25 100,000 hours without special inspection and necessary

26 refurbishment may cause unexpected damage on Power Turbine and

27

28

                                    4

1  other associated equipment."[3]  (Ishizuka Decl. Ex. C at 190-91.)

2  However, it also contends that despite having performed several

3  recent inspections and repairs of related components, defendant

4  never advised plaintiff that the blade retainers urgently needed

5  replacement and that failure to do so as soon as possible might

6  cause serious damage.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J.

7  7-8.)

8      As noted above, plaintiff alleges that serious damage

9  did occur on August 7, 2000 when "three serrations [a.k.a. blade

10 retaining slots or blade retainers] of the IM5000 power turbine's

11 first stage rotor disk failed during operation, releasing each of

12 their three rotor blades which then passed downstream through the

13 turbine."  (Compl. ¶ 8.)  Subsequently, plaintiff filed suit in

14 state court, seeking damages for (1) design defect; (2) failure

15 to warn (of a design defect); (3) negligence; (4) breach of

16 implied warranty of fitness for a particular purpose; and (5)

17 breach of contract.  (Id. ¶¶ 10-44.)  Defendant removed the case

18 to this court and now seeks summary judgment pursuant to Federal

19 Rule of Civil Procedure 56(c).

20 II.  Discussion

21      Discovery is still ongoing in this case and dispositive

22 motions are not due until January 19, 2007.  (Jan. 17, 2006 Am.

23 Scheduling Order 2.)  However, to avoid the expense of having to

24 conduct depositions of defendant's current and former employees

25 _____

26 [3]    The invoices sent to plaintiff suggest that it did make
   some of the replacements recommended in the 1995 service notice.
   (Suzuki Decl. Ex. F at 211-12, 224 (charging for a Power Turbine
27 Rotor Repair--which, from earlier investigatory notes prepared by
   defendant, appears to have included rotor shaft and blade
28 replacements--and Turbine Casing Spare Parts).)

1  in Japan in September, defendant seeks summary judgment now,

2  arguing that plaintiff cannot bring tort claims (claim one

3  through three), which require evidence of actual damage, given

4  that plaintiff suffered only economic loss.   Defendant also

5  contends that plaintiff's contract claims are barred by the

6  warranty limitations to which its predecessor agreed and those

7  implied by law.

8       A.   Legal Standard

9            Summary judgment is proper "if the pleadings,

10 depositions, answers to interrogatories, and admissions on file,

11 together with the affidavits, if any, show that there is no

12 genuine issue as to any material fact and that the moving party

13 is entitled to judgment as a matter of law."  Fed. R. Civ. P.

14 56(c).  A material fact is one that could affect the outcome of

15 the suit, and a genuine issue is one that could permit a

16 reasonable jury to enter a verdict in the non-moving party's

17 favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

18 (1986).  The party moving for summary judgment bears the initial

19 burden of establishing the absence of a genuine issue of material

20 fact and can satisfy this burden by presenting evidence that

21 negates an essential element of the non-moving party's case.

22 Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

23 Alternatively, the movant can demonstrate that the non-moving

24 party cannot provide evidence to support an essential element

25 upon which it will bear the burden of proof at trial.   Id.

26           Once the moving party meets its initial burden, the

27 non-moving party must "go beyond the pleadings and by her own

28 affidavits, or by 'the depositions, answers to interrogatories,

6

1    and admissions on file,' designate 'specific facts showing that

2    there is a genuine issue for trial.'"  Id. at 324 (quoting Fed.

3    R. Civ. P. 56(e)).  The non-movant "may not rest upon the mere

4    allegations or denials of the adverse party's pleading."  Fed. R.

5    Civ. P. 56(e); Valandingham v. Bojorquez, 866 F.2d 1135, 1137

6    (9th Cir. 1989).  However, any inferences drawn from the

7    underlying facts must be viewed in the light most favorable to

8    the party opposing the motion.  Matsushita Elec. Indus. Co., Ltd.

9    v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

10        B.   Products Liability (Claims One and Two)

11            Plaintiff's first and second causes of action, for

12    design defect and failure to warn of a design defect, are

13    essentially products liability tort claims.  In California,

14    "plaintiffs may [only] recover in tort for physical injury to

15    person or property [and] not for purely economic losses that may

16    be recovered in a contract action."[4]  S.F. Unified Sch. Dist. v.

17    W.R. Grace & Co., 37 Cal. App. 4th 1318, 1327 (1995) (citing

18    Seely v. White Motor Co., 63 Cal. 2d 9, 18-19 (1965)); Aas v.

19    Superior Court, 24 Cal. 4th 627, 646 (2000) ("[A]ppreciable,

20    nonspeculative present injury is an essential element of a tort

21    cause of action."), superceded on other grounds by Cal. Civ. Code

22    §§ 895-945.5.  The California Supreme Court has further clarified

23

24        [4]    This rule is otherwise known as the "Economic Loss
     Doctrine" and it is based on an accepted understanding that a
25    merchant cannot be held liable when a product does not meet the
     consumer's commercial expectations, absent "an agreement, defined
26    by practice or otherwise" to deliver a certain level of quality.
     Seely, 63 Cal. 2d 16-17; id. at 18 ("[A manufacturer] cannot be
27    held [liable] for the level of performance of his products in the
     consumer's business unless he agrees that the product was
28    designed to meet the consumer's demands.").

that physical injury to property must consist of "damage to 'other property,' that is, <u>property other than the product itself</u>." <u>Jimenez v. Superior Court</u>, 29 Cal. 4th 473, 483 (2002). "The law of contractual warranty governs damage to the product itself." <u>Id.</u>

Given this standard, the court's inquiry is seemingly straightforward, as the only damage plaintiff suffered was damage to the allegedly defective turbine caused by its component parts. However, the overwrought blade retainers are not necessarily part of "the product itself" (i.e., the turbine). "In a case involving component-to-component damage [the trier of fact must] determin[e] whether the defective part is a sufficiently discrete element of the larger product that it is not reasonable to expect its failure invariably to damage other portions of the finished product." <u>KB Home v. Superior Court</u>, 112 Cal. App. 4th 1076, 1087 (2003). More specifically, the character of the responsible part is defined by the answers to the following questions:

> (1) Does the defective component . . . perform an integral function in the operation of the larger product . . . ?
> (2) Does the component have any independent use to the consumer, that is some use other than as incorporated into the larger product?
> (3) How related is the property damage to the inherent nature of the defect in the component?
> (4) Was the component itself or the larger product placed into the stream of commerce (or, viewed from the buyer's perspective, was the larger integrated product or the component itself the item purchased by the plaintiff)?

<u>Id.</u> at 1086; Cal. BAJI 9.02 (further noting that at trial, plaintiff has the burden of establishing that the damaged property is separate from the defective property).

Generally, whether a component part damaged part of a

8

1   larger product (the product itself) or other property is a

2   question for the jury to resolve.  KB Home, 112 Cal. App. 4th at

3   1087.  Nevertheless, if the facts required to address these

4   inquiries are uncontested, the court can draw the line between

5   the defective product and other property.  Id. at 1080 n.2

6   ("Summary judgment, of course, may be proper if 'the

7   uncontradicted facts established through discovery are

8   susceptible of only one legitimate inference . . . .'" (quoting

9   Jolly v. Eli Lilly & Co., 44 Cal. 3d 1103, 1112 (1988)

10  (alteration in original)).

11          Although the parties largely ignore the KB Home factors

12  in their submitted arguments, it appears undisputable that the

13  "IM5000 is an integrated machine, manufactured and sold in its

14  entirety by [defendant] . . . ."  (Def.'s Reply 5; see also

15  (Shimura Decl. Ex. A (purchase agreement and specifications).)

16  Defendant also argues, albeit without explanation, that the

17  IM5000 is "nonfunctional" without the blade retainers.

18  Additionally, it is clear from the photographs submitted that the

19  blade retainers (and the rotor disks of which they are a seamless

20  part) are specifically designed to accommodate the rotor blades

21  manufactured by defendant and consequently, the court cannot

22  imagine any independent use for this component outside of its use

23  within the turbine.  (See Furman Decl. Ex. 1.7.)  Therefore,

24  based on defendant's arguments and other evidence, the first,

25  second, and fourth factors favor treatment of the turbine and its

26

27

28

component parts as a single product.[5]  Significantly, plaintiff
produced no evidence that might cast doubt on these conclusions
and provided only bald assertions that the blade retainers are a
discrete product.

Regarding the third factor, neither party has fully
described the "extensive[] damage[]" that allegedly occurred.
(Compl. ¶ 9.)  Nevertheless, given that plaintiff has
characterized the defective part as "blade retainers" and failure
to retain the rotor blades allowed them to break free and cause
damage, the only reasonable conclusion a jury could draw in this
case is that the damage resulted from the inherent nature of the
defect in the component.  The third factor therefore further
supports defendant's argument that the rotor components were part
of the product itself, which was the only property that suffered
damage.  Cf. East River S.S. Corp. v. Transamerica Delaval, 476

_____

[5]      The court in McDowell Valley Vineyards, Inc. v. Sabate
USA Inc., No. C-04-708, 2004 WL 1771574, at *4 (N.D. Cal. Aug. 6,
2004), extracted four additional factors from KB Home that
address: (1) "whether the component was purchased from another
manufacturer;" (2) "whether the larger product was sold in other
markets without the component;" (3) "whether the component can be
readily removed from the larger product; and" (4) "whether the
component has been used in other applications."  Here, the
component was not purchased from another manufacturer (additional
factor 1).  Additionally, plaintiff did not challenge defendant's
assertion that the machine can not function without the rotor
components and from this the court can infer (1) that the IM5000
is not sold in other markets without blade retainers and (2) that
these components cannot be removed from the larger product
(additional factors 2 and 3).  Finally, although the parties have
not presented direct evidence of the fourth factor, use in other
applications, the fact that plaintiff and other IM5000 owners
must share a limited pool of spare parts amongst themselves (see,
e.g., July 28, 2006 Suzuki Decl. Ex. H at 2) suggests that some
of the internal parts of the turbine, including perhaps the
retaining blades, are not used in other applications.  Taken
together then, the additional McDowell Valley factors also do not
support plaintiff's position.

U.S. 858, 871 (1986) (concluding that defective turbines that damaged themselves were a single unit based simply on the fact that, as here, "each turbine was supplied by [the turbine designer, manufacturer, and installer] as an integrated package . . . .").[6]  Defendant is thus entitled to summary judgment because all four factors suggest that the blade retainers were intrinsic, not discrete, elements of the turbine and, as noted above, a purchaser cannot bring a products liability claim absent damage to "property other than the product itself." Jimenez, 29 Cal. 4th at 483.

C.   Negligence (Claim Three)

To the extent that plaintiff's negligence claim is based on defendant's "duty to exercise reasonable care in their design, manufacture, supply, [and] sale" of the IM5000, (Compl. ¶ 26), the analysis is the same as for its products liability claims. Seely, 63 Cal. 2d at 18 ("Even in actions for negligen[t] [construction], a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone."); Aas, 24 Cal. 4th at 636.  Consequently, this portion of the claim is likewise subject to summary judgment.

---

[6]   Contrary to plaintiff's arguments, the blade retainers in the IM5000 are not comparable to windows in a house. Cf. Jimenez, 29 Cal. 4th at 484 ("[T]he manufacturer of a defective window installed in a mass-produced home may be held strictly liable in tort for damage that the window's defect causes to other parts of the home in which it is installed.").  The retainers are not fungible fixtures made by a third party who is not responsible for, or even involved in, completion of the final product.  Rather, they are integral and necessary components of a machine that is designed, constructed, and supplied by a single entity.

1    However, plaintiff's negligence claim also alleges

2   negligent "inspection, service, repair, maintenance and/or

3   recertification of the stage one rotor and its component parts."

4   (Compl. ¶ 26.)   In other words, it alleges that defendant

5   negligently performed services, separate and apart from supplying

6   defective products.   At least one California court has observed

7   that "[t]he question of whether a plaintiff may recover damages

8   for economic loss, absent physical injury to person or property,

9   has been answered differently in cases involving the quality and

10  condition of goods from when plaintiff's loss arises from a

11  negligent performance of services."   N. Am. Chem. Co. v. Superior

12  Court, 59 Cal. App. 4th 764, 777 (1997).   Articulating the

13  specifics of this difference, the North American Chemical court

14  noted that "[a] contract to perform services gives rise to a duty

15  of care which requires that such services be performed in a

16  competent and reasonable manner" and "negligent failure to do so

17  may be both a breach of contract and a tort."   Id. at 774; see

18  also Moreno v. Sanchez, 106 Cal. App. 4th 1415, 1435 (2003)

19  ("[T]he negligent failure to exercise reasonable care and skill

20  in undertaking to perform a service contract . . . is a tort, as

21  well as a breach of contract.").

22    The California Supreme Court has refused to adopt the

23  North American Chemical reasoning, noting that "[a] person may

24  not ordinarily recover in tort for the breach of duties that

25  merely restate contractual obligations", but at the same time it

26  has continued to apply the J'Aire test on which North American

27  Chemical is based.   Aas, 24 Cal. 4th at 643; J'Aire Corp. v.

28  Gregory, 24 Cal. 3d 799 (1979).   J'Aire establishes a six factor

12

balancing test that determines when a contractual duty rises to a
duty of care capable of supporting a negligence claim.  The
factors include:

> (1) the extent to which the transaction was intended to affect the plaintiff,
> (2) the foreseeability of harm to the plaintiff,
> (3) the degree of certainty that the plaintiff suffered injury,
> (4) the closeness of the connection between the defendant's conduct and the injury suffered,
> (5) the moral blame attached to the defendant's conduct and
> (6) the policy of preventing future harm.

J'Aire Corp., 24 Cal. 3d at 804.  Neither party addressed this
test and its application in this case.

Regardless, even assuming that the J'Aire requirements
are satisfied here and that defendant owed plaintiff a duty of
care beyond its contractual obligations, the undisputed facts
conclusively show that defendant fulfilled the duty that
plaintiff alleges.  Specifically, plaintiff claims that defendant
had a duty to inspect the blade retainers and warn plaintiff that
they needed to be repaired or replaced.  (Compl. ¶¶ 28-29.)  Yet
defendant did warn plaintiff in May, 2000 that the "disks for
state 1 to 3 [were] under high stress" and recommended that they
be replaced "with the new ones if Wheelabrator plans to use the
IM5000 . . . more longer."  (Ishizuka Decl. Ex. E at 201-02.)
Significantly, the blade retainers at issue here are an
inseparable part of the turbine's first stage rotor (i.e., the
disk for stage 1), which plaintiff continued to use despite

1  defendant's advice to replace it.[7]   Plaintiff appears to take

2  issue with defendant's failure to <u>really</u> impress upon plaintiff

3  that it needed to take <u>immediate</u> action.   However, this does not

4  change the fact that defendant advised plaintiff to replace the

5  rotor disks and thereby discharged any duty it may have had to

6  warn plaintiff that these parts needed repair.   Defendant is thus

7  entitled to summary judgment on the entirety of plaintiff's

8  negligence claim.

9          D.   <u>Breach of Implied Warranty (Claim Four)</u>

10  _____   Plaintiff further alleges that defendant breached an

11  implied warranty of fitness for a particular purpose when,

12  despite "know[ing] that Plaintiff intended to use its first stage

13  one blade retainers for a particular purpose", defendant failed

14  to replace or repair them.   (Compl. ¶¶ 33-36.)   To the extent

15  that plaintiff alleges that defendant was negligent while

16  performing repairs, in other words provided inadequate services,

17  plaintiff has failed to state a claim for breach of implied

18  warranty.   (<u>See</u> compl. ¶ 35 (attributing its failure to replace

19  the retainers to its reliance on defendant's "skill and

20  judgment").)   The implied warranty of fitness for a particular

21

22          [7]   At oral argument, in an attempt to show that defendant
    expressly misrepresented that the blade retainers were in working
23  condition, plaintiff selectively quoted a report prepared by
    defendants regarding repairs conducted in May, 2000.   However, in
24  the report, under the subheading "Operation", defendant simply
    wrote that "the <u>power turbine</u> is in a good condition except disk
25  space tempe-rature."   (Ishizuka Decl. Ex. E at 200 (emphasis
    added).)   Furthermore, in the subsequent subsection covering its
26  "Recommendations", defendant explicitly advised plaintiff to
    replace rotor disks 1 through 3.   (<u>Id.</u> at 201-02.)   Plaintiff
27  thus has no basis for its assertion that defendant represented
    that the rotor in general and the blade retainers in particular
28  were capable of continued use without repair.

purpose applies only to sales contracts.  Allied Props. v. John
A. Blume & Assocs., 25 Cal. App. 3d 848, 855 (1972) ("[T]he well
settled rule in California is that where the primary objective of
a transaction is to obtain services, the doctrines of implied
warranty and strict liability do not apply."); Gottsdanker v.
Cutter Labs., 182 Cal. App. 2d 602, 608 (1960) ("[I]mplied
warranties of fitness and of merchantability are enforceable only
against a seller.").

Additionally, to the extent that plaintiff is asserting
that the blade retainers supplied by defendant in 1988 (as part
of the rotor replacement) were not fit for their intended
purpose, this claim is not supported by the evidence in this
case.[8]  Even assuming that defendant's 1981 warranty disclaimer
does not apply to this component,[9] the implied warranty of

---

[8]     Defendant erroneously cites California Civil Code §
1791.1(3) for the proposition that even if an implied warranty
existed, it expired in 1989--one year after defendant supplied a
new rotor (in 1988).  Id. ("[I]n no event shall such implied
warranty have a duration of . . . more than one year following
the sale of new consumer goods to a retail buyer.").  By its
terms, § 1791.1 applies only to individual consumers and not
sophisticated corporate customers like plaintiff.  Cal. Civ. Code
§ 1791(a)-(b) (defining the protected "retail buyer" as "any
individual who buys" "new product[s] . . . that [are] used,
bought, or leased for use primarily for personal, family, or
household purposes" (emphasis added)).  The applicable source for
plaintiff's implied warranty claim in this case is California
Commercial Code § 2315.

[9]     Defendant argues that the 1981 warranty, which covered
defects in material for less than two years and otherwise
"replace[d] any other warranty or guarantee imposed or implied by
law, customarily or otherwise", should primarily bar plaintiff's
fourth cause of action.  (Id. (Article 12.5).); see Cal. Com.
Code § 2316 ("Language to exclude all implied warranties of
fitness is sufficient if it states, for example, that 'There are
no warranties which extend beyond the description on the face
hereof.'").  It further argues that modification of that written
warranty cannot be implied from defendant's repair activities.

fitness for a particular purpose that plaintiff seeks to invoke

arose "at the time of contracting", meaning when the sale or

supply of the rotor occurred in 1988.  The component then

proceeded to function as expected for 100,800 hours over the

course of twelve years and exceeded its design life--a limitation

that defendant repeatedly reminded plaintiff of over the years.

Assuming that the "particular purpose" on which plaintiff's

implied warranty was based pertains to its intent to operate the

IM5000 beyond its design life,[10] plaintiff has failed to produce

any evidence that it communicated such expectations to defendant

"at the time of contracting."  Moreover, as discussed in more

detail in the next section, plaintiff has no evidence that

defendant ever agreed that the IM5000 could operate beyond

100,000 hours.  <u>See</u> Cal. Com. Code § 2316 ("An implied warranty

can . . . be . . . modified by course of dealing or course of

performance . . . .").  Therefore, plaintiff has no grounds for

asserting an implied warranty of fitness and summary judgment on

its fourth cause of action is warranted.

_____

See <u>Eisenberg v. Alameda Newspapers, Inc.</u>, 74 Cal. App. 4th 1359, 1387 (1999) ("There cannot be a valid express contract and an implied contract, each embracing the same subject, but compelling different results.").  Finally, defendant contends that allowing repair and replacement activities to put this case outside the scope of a carefully negotiated limitation on its liability would violate the intent of the 1981 agreement.  (Def.'s Reply 3.) Nevertheless, as observed above in note 1 and the accompanying text, the warranty is vague regarding its application to repair and replacement parts and it is thus not as "carefully" constructed, or as clearly applicable, as defendant insists. Because the court can grant defendant's motion as to the fourth cause of action on other grounds, however, it need not interpret the intent and scope of the 1981 purchase agreement.

[10]     Significantly, in the face of defendant's summary judgment motion, plaintiff has not even defined the "particular purpose" that it allegedly communicated to defendant.

1          E.   Breach of Contract (Claim Five)

2               Plaintiff also alleges breach of contract based on the

3   service/repair contracts that it argues were separate and

4   distinct from the 1981 purchase agreement (which expressly

5   limited any and all warranties to those provided in the

6   agreement).  From the pleadings and the papers related to this

7   motion, it appears that plaintiff's claim is based on a belief

8   that the scope of the maintenance work performed by defendant

9   included an agreement to evaluate the residual life of the

10  turbine package.  Additionally, plaintiff seems to suggest that

11  defendant's "re-certification" of the turbine following its

12  inspections and repairs included some unsaid guarantee that the

13  turbine would operate indefinitely.

14               However, as previously noted, based on the facts before

15  the court, plaintiff had no reasonable basis for expecting that

16  defendant's product would continue to operate for an additional

17  indefinite, or even fixed, amount of time beyond the 100,000 hour

18  mark.  Defendant reminded plaintiff on several occasions that its

19  product was designed to last for 100,000 hours and described

20  operation after that point as "a new challenge to a new

21  millennium."  (Shimura Decl. Ex. G at 197.)  Significantly,

22  plaintiff admits that defendant made no guarantees that the

23  turbine could endure continued operations.  (Pl.'s Opp'n to

24  Def.'s Mot. for Summ. J. 10 (conceding that "[defendant] did not

25  communicate its expectations to Plaintiff regarding the further

26  useful life of the retainer slots").)  Moreover, any such

27  guarantee would have been totally inconsistent with defendant's

28  well documented position that its product's capacity for

17

1  operating beyond 100,000 hours was unknown.

2          Additionally, even if, as plaintiff contends, defendant

3  had contracted to determine the residual life of the turbine,[11]

4  this does not translate into a guarantee that the turbine would

5  survive long enough for defendant to complete this investigation.

6  Assuming that such a contract even existed, plaintiff has not

7  suggested a deadline for this work.  Consequently, defendant

8  could not have actually breached any agreement.  At most, the

9  damage, assuming it is irreparable, relieved defendant of any

10 obligation to complete its residual life evaluation.  See Levy v.

11 Caledonian Ins. Co., 156 Cal. 527, 530 (1909) (reciting the "well

12 established rule" that performance is excused "where a contract

13 is made in contemplation of the continued existence of a

14 subject-matter which is, after the making of the contract,

15 destroyed without the fault of either party.").

16          Based on these circumstances, summary judgment on

17 plaintiff's fifth cause of action is proper.  Additionally, the

18 court declines to exercise its discretion pursuant to Rule 56(f)

19 to continue this motion to permit further discovery.  Plaintiff

20 has no evidence, not even a declaration from one of its

21 employees, that defendant made any representations regarding the

22 turbine's useful life after 100,000 hours.  Similarly, plaintiff

23

24          [11]  The available evidence casts considerable doubt on
   plaintiff's contention that an agreement to evaluate the residual
25 life of plaintiff's IM5000 existed.  Notably, when asked whether
   it was interested in an "IM5000 PT residual Part Life Study
26 program", plaintiff responded on May 10, 2000 that it was "not
   familiar with this program."  (July 28, 2006 Suzuki Decl. Ex. K
27 (Questionnaire on IHI IM5000 Power Turbine).)  If plaintiff had,
   as alleged, already contracted for such a study, one would expect
28 that it would have responded accordingly in the survey.

1  has no evidence, and has not even alleged, that an agreement to

2  complete the residual life evaluation before August 7, 2000

3  existed.   Perhaps most troubling, plaintiff has not presented, in

4  response to defendant's motion for summary judgment, the facts on

5  which it based its decision to file a claim for breach of

6  contract.   The contracts and whatever other documents there might

7  be to support plaintiff's claim are something that should already

8  be in plaintiff's possession.   The court cannot continue a motion

9  for summary judgment based solely on plaintiff's hope that some

10 document obtained through future discovery might sustain a claim

11 for which it seemingly has no basis.[12]   Compare 321 Studios v.

12 Metro Goldwyn Mayer Studios, Inc., 307 F. Supp. 2d 1085, 1091

13 (N.D. Cal. 2004) (noting that to secure a continuance of a motion

14 for summary judgment, a party should "identif[y] relevant

15 information to be discovered, and [the] basis for believing that

16 such information actually exists." (citing VISA Int'l Serv. Ass'n

17 v. Bankcard Holders, 784 F.2d 1472, 1475 (9th Cir. 1986)), with

18 (Fruman Decl. ¶ 4 (stating very generally his reasons for needing

19 further time for discovery: "I intend to ask the deponents, inter

20 alia, about the material facts described by the parties hereto as

21

22      [12]   Plaintiff concedes that it does not have all of the
23 terms of the contracts for services performed in December, 1999
   and May, 2000 and that it has not even "alleged the nature or
24 terms of any contract pertaining to these services."  (Pl.'s
   Opp'n to Def.'s Mot. for Summ. J. 14.)   The little evidence that
25 plaintiff has produced demonstrates only that an ongoing contract
   to evaluate the residual life of the turbine may have existed.
26 (Id. at 15.)   Plaintiff offers no support, or even an explanation
   of the basis, for its theories that (1) the contract for a
27 residual life investigation was past due and thus breached at the
   time of the accident; (2) defendant agreed to repair "the turbine
28 engine as a whole prior to the failure"; or (3) the terms of the
   alleged contract guaranteed future functionality of the turbine.

19

1   both 'disputed' and 'undisputed'")).

2   III. <u>Conclusion</u>

3          Although plaintiff's property was damaged when
4   allegedly defective rotor blade retainers failed to perform as
5   expected, the defective parts were not a sufficiently discrete
6   element of the turbine such that their failure would not be
7   expected to cause damage to other portions of the IM5000.
8   Accordingly, the economic loss doctrine bars plaintiff's claims
9   for products liability and negligent product design.  Summary
10  judgment on the portion of plaintiff's negligence claim alleging
11  the negligent provision of services is likewise proper because
12  the facts show that, assuming defendant had a duty above and
13  beyond its contractual obligations, it performed the duties that
14  plaintiff attempts to charge it with.

15         Summary judgment is also warranted on plaintiff's
16  breach of warranty and contract claims because plaintiff has
17  failed to identify any evidence of terms that defendant may have
18  breached (or even explain what terms it <u>suspects</u> might exist).
19  Plaintiff is not entitled to further discovery on claims that
20  appear to be based on nothing more than theories and conjecture.

21         IT IS THEREFORE ORDERED that defendant's motion for
22  summary judgment be, and the same hereby is, GRANTED.

23  DATED:  August 28, 2006

24

25  _____
    WILLIAM B. SHUBB
26  UNITED STATES DISTRICT JUDGE

27

28

                            20